**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| FREEDOM WATCH, INC.,<br><br>                    Plaintiff,<br><br> v.<br><br>ROBERT S. MUELLER III, *et al.*<br><br>                    Defendants. |

No. 18-cv-88 (EGS)

## <u>MEMORANDUM OPINION</u>

Plaintiff Freedom Watch, Inc., a non-profit organization, brings this action against Defendants Robert S. Mueller III ("Mr. Mueller"), United States Department of Justice ("DOJ"), and Federal Bureau of Investigation ("FBI") (collectively, "DOJ") under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Freedom Watch seeks to obtain certain records from DOJ and the Special Counsel's Office ("SCO")—a component of DOJ—concerning the investigation into Russia's interference in the 2016 presidential election and related matters—specifically, communications to and from the media pertaining to the activities of the FBI, Mr. Mueller, and his staff.

Pending before the Court is DOJ's motion for summary judgment. Upon careful consideration of the motion, opposition, and reply thereto, the applicable law, and the entire record herein, the Court **GRANTS** DOJ's Motion for Summary Judgment.

## I.  Background

The following facts—drawn from the parties' submissions—are undisputed, unless otherwise indicated. On May 17, 2017, then-Acting Attorney General Rod J. Rosenstein appointed Mr. Mueller to serve as Special Counsel for DOJ and authorized him to investigate the Russian government's efforts to interfere in the 2016 presidential election, including any matters arising from that investigation. Defs.' Ex. 2, ECF No. 36-4 at 25 (Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters, Order No. 3915-2017).[1] Seven months later, on January 2, 2018, Freedom Watch submitted a FOIA request to DOJ, the FBI, and the SCO, seeking to obtain the following:

> [D]ocuments and records . . . that refer or relate with regard to communications to and from the media . . . concerning the activities of [Mr.] Mueller and/or his staff as well as the [FBI], concerning the investigation of alleged Russian collusion and related matters concerning the Trump Presidential Campaign and the Trump Transition Team . . . .

*E.g.*, *id*. at 20 (FOIA Request); Defs.' Statement of Material Facts ("Defs.' SOMF"), ECF No. 36-5 at 1 ¶ 1; Pl.'s Counter Statement of Material Facts ("Pl.'s SOMF"), ECF No. 37-1 at 2 ¶

---

[1] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

1; Defs.' Reply to Pl.'s SOMF, ECF No. 38-1 at 1 ¶ 1.[2] Freedom
Watch subsequently narrowed its FOIA request to "records of
communications to and from the media rather than purely internal
communications." Defs.' SOMF, ECF No. 36-5 at 1-2 ¶ 2.

Before the FBI granted Freedom Watch's request for
expedited processing on January 23, 2018, *id*. at 2 ¶ 4, Freedom
Watch commenced the instant action on January 15, 2018, *id*. at 2
¶ 3. DOJ's Office of Information Policy ("OIP") informed Freedom
Watch that its request for expedited processing had been granted
for the records maintained by the SCO and DOJ's Public Affairs
Office ("PAO") on February 20, 2018. *Id*. at 2 ¶ 5. On the same
day, DOJ filed the answer to Freedom Watch's complaint. *Id*. at 2
¶ 6. Freedom Watch moved for summary judgment on March 23, 2018,
*see generally* Pl.'s Mot. for Summ. J., ECF No. 10; the parties
then filed status reports at the Court's direction concerning
DOJ's production of the requested materials, *see generally*
Docket for Civ. Action No. 18-88; and the Court denied as moot
Freedom Watch's motion for summary judgment in light of the
Court's Order directing DOJ to produce all non-exempt documents
responsive to Freedom Watch's FOIA request, Min. Order of May
25, 2018.

---

[2] From May 2017 to March 2019, Mr. Mueller investigated Russia's
interference in the 2016 election. *Elec. Privacy Info. Ctr. v.
DOJ*, No. CV 19-810 (RBW), 2020 WL 1060633, at *2 (D.D.C. Mar. 5,
2020).

DOJ released responsive materials to Freedom Watch, withholding, in part, certain records under FOIA exemptions. *E.g.*, Defs.' Ex. 1, ECF No. 36-3 at 57-80 (OIP's *Vaughn* Index); Defs.' Ex. 2, ECF No. 36-4 at 37-42 (FBI's *Vaughn* Index).[3] Following DOJ's notice to the Court regarding a technical issue with its searches of responsive documents, *see* Defs.' Status Report, ECF No. 24 at 1-3, Freedom Watch sought discovery and *in camera* review, *see, e.g.*, Min. Order of Nov. 26, 2018; Joint Status Report, ECF No. 27 at 1-2; Pl.'s Resp. to Order of the Court, ECF No. 29 at 1. This Court denied Freedom Watch's request for discovery and *in camera* review as premature, finding, among other things, that the request was based on mere conjecture. Min. Order of Jan. 3, 2019 (explaining that "there

---

[3] DOJ invokes Exemptions 5, 6, and 7(C). *E.g.*, Decl. of Vanessa R. Brinkmann ("Brinkmann Decl."), ECF No. 36-3 at 4 ¶¶ 6-8; Decl. of David M. Hardy ("Hardy Decl."), ECF No. 36-4 at 9 ¶ 18. Exemption 5 covers "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." *Id.* § 552(b)(6). Exemption 7(C) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7)(C). And "[a] *Vaughn* index describes the documents withheld or redacted and the FOIA exemptions invoked, and explains why each exemption applies." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1145 n.1 (D.C. Cir. 2015) (citing *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973); *Keys v. DOJ*, 830 F.2d 337, 349 (D.C. Cir. 1987)).

[was] no basis in reality to believe that [DOJ's] disclosure" of the technical issue "was, as Freedom Watch puts it, an 'attempt to shield themselves from the public seeing evidence of their routinely leaking grand jury information to the media and other disclosures for their tactical motivations'").

On April 8, 2019, DOJ moved for summary judgment. *See* Defs.' Mot. for Summ. J. ("Defs.' MSJ"), ECF No. 36 at 1; *see generally* Defs.' Mem. of Law in Supp. of Defs.' MSJ ("Defs.' Mem."), ECF No. 36-1. On May 9, 2019, Freedom Watch filed its opposition brief. *See generally* Pl.'s Opp'n, ECF No. 37.[4] On June 10, 2019, DOJ filed the reply brief. *See generally* Defs.' Reply, ECF No. 38. The motion is ripe and ready for the Court's adjudication.

## II. **Legal Standard**

The "vast majority" of FOIA cases can be resolved on summary judgment. *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011). A court may grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under FOIA, "the underlying facts and the inferences to be drawn from them are

---

[4] Freedom Watch's opposition brief was not accompanied by a proposed order as required by Local Civil Rule 7.1(c). *See* LCvR 7.1(c) ("Each motion and opposition shall be accompanied by a proposed order.").

construed in the light most favorable to the FOIA requester[,]"
and summary judgment is appropriate only after "the agency
proves that it has fully discharged its [FOIA] obligations . . .
." *Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996) (citations
omitted).

When considering a motion for summary judgment under FOIA,
the court must conduct a *de novo* review of the record. *See*
5 U.S.C. § 552(a)(4)(B). The court may grant summary judgment
based on information provided in an agency's affidavits or
declarations when they are "relatively detailed and non-
conclusory," *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200
(D.C. Cir. 1991) (citation omitted), and "not controverted by
either contrary evidence in the record nor by evidence of agency
bad faith," *Military Audit Project v. Casey*, 656 F.2d 724, 738
(D.C. Cir. 1981). Such affidavits or declarations are "accorded
a presumption of good faith, which cannot be rebutted by 'purely
speculative claims about the existence and discoverability of
other documents.'" *SafeCard Servs.*, 926 F.2d 1197 at 1200
(citation omitted).

## III. Analysis

Freedom Watch challenges DOJ's response to its FOIA request
on five fronts: (1) the adequacy of DOJ's search; (2) the
withholding of documents under Exemption 5's deliberative
process privilege; (3) the withholding of names and other

personal identifying information pursuant to Exemption 6;
(4) the withholding of certain portions in a single e-mail under
Exemption 7(C); and (5) DOJ's segregability determinations.
Pl.'s Opp'n, ECF No. 37 at 3-13. The Court addresses each
challenge in turn.

### A. The Adequacy of DOJ's Search for Responsive Records

To demonstrate the adequacy of its search at the summary
judgment stage, DOJ "must show that it made a good faith effort
to conduct a search for the requested records, using methods
which can be reasonably expected to produce the information
requested." *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68
(D.C. Cir. 1990). "[T]he issue to be resolved is not whether
there might exist any other documents possibly responsive to the
request, but rather whether the *search* for those documents was
*adequate*." *Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir.
1984). "The adequacy of the search, in turn, is judged by a
standard of reasonableness and depends, not surprisingly, upon
the facts of each case." *Id*. To meet its burden, an agency may
provide "a reasonably detailed affidavit, setting forth the
search terms and the type of search performed, and averring that
all files likely to contain responsive materials . . . were
searched." *Iturralde v. Comptroller of Currency*, 315 F.3d 311,
313-14 (D.C. Cir. 2003) (citation and internal quotation marks
omitted). "If, however, the record leaves substantial doubt as

to the sufficiency of the search, summary judgment for the agency is not proper." *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990).

Here, DOJ has demonstrated that it has met its FOIA obligations by conducting an adequate and reasonable search for the responsive records from within OIP, SCO, and the FBI. DOJ's two declarations—(1) Brinkmann declaration; and (2) Hardy declaration—"explain in reasonable detail the scope and method of the search." *Kidd v. DOJ*, 362 F. Supp. 2d 291, 295 (D.D.C. 2005) (citation and internal quotation marks omitted). "To satisfy the dictates of FOIA, [DOJ] must, at a minimum, 'aver that it has searched <u>all</u> files likely to contain relevant documents.'" *Huntington v. U.S. Dep't of Commerce*, 234 F. Supp. 3d 94, 103 (D.D.C. 2017) (quoting *Am. Immigration Council v. Dep't of Homeland Sec.*, 21 F. Supp. 3d 60, 71 (D.D.C. 2014)). For the reasons explained below, the Court is satisfied that OIP and the FBI conducted adequate searches for all locations likely to contain responsive documents. *See, e.g.*, Brinkmann Decl., ECF No. 36-3 at 12 ¶ 25; Hardy Decl., ECF No. 36-4 at 7 ¶¶ 14-15.

### 1. OIP's Search for Responsive Records

OIP—the office responsible for processing FOIA requests for records from within OIP, DOJ's six senior leadership offices, and the SCO—located 5,881 pages of records responsive to Freedom Watch's FOIA request. Brinkmann Decl., ECF No. 36-3 at 2 ¶ 1, 5

¶ 9, 10 ¶ 21. Of particular relevance here, the first declarant avers that "OIP searched for potentially responsive records within two Offices: PAO and SCO." *Id.* at 7 ¶ 13. OIP reasonably determined that both PAO and the SCO likely had records responsive to Freedom Watch's FOIA request for two reasons: (1) Freedom Watch specifically requested communications from the SCO; and (2) PAO is the "office tasked with coordinating relations of DOJ with the news media." *Id.*

According to the first declarant, "OIP conducted broad searches of unclassified email records and computer hard drives for seventeen custodians across these Offices (fifteen within PAO and two within SCO)." *Id.* And the two "SCO custodians were public affairs professionals responsible for communications with the media, and both were on detail from other DOJ components—one from PAO and the other from the United States Attorney's Office for the Eastern District of Virginia (EDVA)." *Id.* at 8 ¶ 15. OIP's search for responsive records included a search of the SCO's general press inquiries electronic mailbox (Specialcounselpress@usdoj.gov). *Id.* The first declarant notes that "OIP did not search hard-copy/paper files" because "none were identified during the course of OIP's search efforts." *Id.* at 7 n.2.

With regard to potentially responsive records within PAO, the first declarant avers that OIP used the date range of July

1, 2015 through December 31, 2017 based on Freedom Watch's proposed start date and cut-off date. *Id*. at 8 ¶ 16. As to the SCO, OIP's "initial search included all emails from the date the email accounts were created through December 31, 2017." *Id*. According to the first declarant, OIP used the following search terms for both PAO and the SCO: "'SCO,' 'OSC,' 'Special Counsel,' or 'Mueller' combined with the terms 'Russia*,' 'Trump Campaign,' 'Trump Presidential Campaign,' or 'Trump Transition.'" *Id*. at 8 ¶ 17. As previously noted, DOJ experienced a technical issue with the initial searches, and OIP re-ran the searches. *Id*. at 9 ¶ 18. In addition, OIP's searches covered potentially responsive text messages from PAO and the SCO. *Id*. at 9 ¶ 19. Uncovering a total of 5,881 pages of responsive records, OIP released, in part, 1,941 pages with redactions to Freedom Watch; and OIP released, in full, the remaining 3,939 pages without redactions. *Id*. at 12 ¶ 26.

## 2. FBI's Search for Responsive Records

The FBI located 320 pages of responsive records. Hardy Decl., ECF No. 36-4 at 9 ¶ 18. Typically, the FBI searches its Central Records System that consists of "applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its integrated missions and functions as law enforcement, counterterrorism, and intelligence agency to

include performance of administrative and personnel functions."
*Id.* at 5 ¶ 11. Given Freedom Watch's request for communications
to and from the media, however, the FBI reasonably determined
that a targeted search within its Office of Public Affairs
("OPA") would yield responsive records. *Id.* at 7 ¶ 14. OPA—the
office that "manages and oversees the FBI's media relations"—
approves and coordinates communications between FBI personnel
and the media concerning FBI matters. *Id.* at 7 ¶ 15.

The FBI identified the OPA employees with media contacts,
and searched the e-mail accounts of those employees using the
date range of July 1, 2015 through December 31, 2017. *Id.* at 7-8
¶ 16. The FBI used search terms similar to OIP's search terms.
*Id.*[5] The second declarant avers that OPA sent the responsive
records to the FBI's Record/Information Dissemination Section
("RIDS"), and RIDS used the search terms to run "an automated e-
mail search of the [OPA] employees' e-mail accounts." *Id.* at 8 ¶
17. RIDS located additional responsive records, adding to the
total pages of responsive records. *Id.* at 9 ¶¶ 17-18. Based on

---

[5] The FBI used the following search terms: "'SCO' AND 'Russia';
'SCO' AND 'Trump campaign'; 'SCO' AND 'Trump Presidential
Campaign'; 'SCO' AND 'Trump Transition'; 'OSC' AND 'Russia';
'OSC' AND 'Trump campaign'; 'OSC' AND 'Trump Transition';
'Special Counsel' AND 'Russia'; 'Special Counsel' AND 'Trump
Campaign'; 'Special Counsel' AND 'Trump Presidential Campaign';
'Special Counsel' AND 'Trump Transition'; 'Mueller' AND
'Russia'; 'Mueller' AND 'Trump Campaign'; 'Mueller' AND 'Trump
Presidential Campaign'; 'Mueller' AND 'Trump Transition[.]'"
Hardy Decl., ECF No. 36-4 at 8 ¶ 16.

the search and review, the second declarant avers that "[t]he
FBI found no information or leads logically leading to other
locations where responsive records would likely be located." *Id.*
at 9 ¶ 17. In the final analysis, the FBI released 171 pages of
responsive records in full, and 122 pages in part, withholding
in full 27 pages. *Id.* at 9 ¶ 18.

### 3. DOJ's Search Was Adequate Under the Reasonableness Standard

DOJ argues—and the Court agrees—that "[r]easonableness, not
perfection, is . . . the Court's guiding principle in
determining the adequacy of a FOIA search." Defs.' Mem., ECF No.
36-1 at 13 (citing cases). Indeed, "[t]he adequacy of an
agency's search is measured by a standard of reasonableness, and
is dependent upon the circumstances of the case." *Truitt*, 897
F.2d at 542 (footnote and internal quotation marks omitted).
Freedom Watch does not dispute the reasonableness standard. *See*
Pl.'s Opp'n, ECF No. 37 at 4. Rather, Freedom Watch contends
that DOJ's search was inadequate because DOJ's "statement [of
material facts] and declarations are deficient." *Id.* In Freedom
Watch's view, DOJ's statement and declarations "fail to provide
a sufficient description of (1) the records searched; (2) who
conducted the search; and (3) the search process." *Id.* DOJ
disagrees, arguing that "[n]othing in [Freedom Watch's]
opposition brief contravenes the declarations of Ms. Brinkmann

or Mr. Hardy, or provides any basis to rebut the presumption that their declarations, and the agencies' searches, were executed in good faith." Defs.' Reply, ECF No. 38 at 8.

Freedom Watch's three arguments are unavailing. First, Freedom Watch argues that DOJ's description of the records searched is inadequate because DOJ "merely restate[s] general policy guidelines in an attempt to explain how [Freedom Watch's] FOIA request was searched" and the "FBI failed to describe whether it searched paper records or all or any electronic records other than certain email accounts of personnel." Pl.'s Opp'n, ECF No. 37 at 4. DOJ responds—and the Court agrees—that "the Brinkmann and Hardy declarations set forth in detail how OIP and the FBI, respectively, conducted tailored and thorough searches for records responsive to [Freedom Watch's] request." Defs.' Reply, ECF No. 38 at 8.

It is undisputed that Freedom Watch only seeks "records of communications to and from the media rather than purely internal communications." Defs.' SOMF, ECF No. 36-5 at 2 ¶ 2. Contrary to Freedom Watch's assertion that the FBI's determination as to its search failed to account for paper and other electronic records, *see* Pl.'s Opp'n, ECF No. 37 at 4, the Hardy declaration explains that the FBI determined that "the most logical location for 'communication' records to or from the media would be within the e-mails of specific authorized employees who have contact with

the media on a regular basis," Hardy Decl., ECF No. 36-4 at 7 ¶ 16. Furthermore, the Hardy declaration states that "[t]he FBI found no information or leads logically leading to other locations where responsive records would likely be located." *Id.* at 9 ¶ 17.

In *Competitive Enterprise Institute v. National Aeronautics & Space Administration*, 989 F. Supp. 2d 74, 93 (D.D.C. 2013), a member of this Court rejected a FOIA requester's argument that the "agency should have searched for paper records" because "there [was] nothing to suggest that responsive documents exist[ed] in paper form" and "[n]o leads emerged during [the agency's] search that required [the agency] to expand its search to include paper records." Similarly, in this case, the FBI did not find any information or leads to extend its search beyond the OPA records. *See* Hardy Decl., ECF No. 36-4 at 9 ¶ 17. The Court therefore finds that the Hardy declaration provides a rationale in a "relatively detailed" and "nonconclusory" fashion for the FBI's search. *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978).

Freedom Watch's next argument—that the Brinkmann and Hardy declarations fail to "disclose who carried out the searches," Pl.'s Opp'n, ECF No. 37 at 4—is foreclosed by case law in this District. "FOIA does not require the disclosure of the names or information about agency staff involved in processing FOIA

14

requests." *Kidder v. FBI*, 517 F. Supp. 2d 17, 24 n.8 (D.D.C. 2007). Courts in this District have repeatedly rejected the argument that an agency's declaration must identify the individuals, by name, who conducted the searches. *See, e.g.*, *Harrison v. Fed. Bureau of Prisons*, 611 F. Supp. 2d 54, 65 (D.D.C. 2009) (finding that a FOIA requester's "dispute[] that [the agency's] searches were adequate because they [did] not identify, by individual name, who was conducting the search" was a "frivolous argument"); *Hillier v. CIA*, No. CV 16-CV-1836 (DLF), 2018 WL 4354947, at *8 (D.D.C. Sept. 12, 2018) (same); *Bigwood v. U.S. Dep't of Def.*, 132 F. Supp. 3d 124, 142-43 (D.D.C. 2015) (same). Moreover, as DOJ correctly points out, "the identities of agency staff who searched for responsive records would be exempt from disclosure under Exemption 6 if [they] were contained in an agency record." Defs.' Reply, ECF No. 38 at 9 (citing *Harrison*, 611 F. Supp. 2d at 65).

Although Freedom Watch is correct that agency declarations must "describe what records were searched, by whom, and through what processes," Pl.'s Opp'n, ECF No 37 at 3 (quoting *Sea Shepherd Conservation Soc'y v. IRS*, 208 F. Supp. 3d 58, 69 (D.D.C. 2016)), Freedom Watch ignores that the "by whom" requirement permits an "agency [to] rely on an affidavit of an agency employee responsible for supervising the search, even if that individual did not conduct the search herself," *Truesdale*

15

*v. DOJ*, 803 F. Supp. 2d 44, 50 (D.D.C. 2011) (citations and internal quotation marks omitted). Here, the Brinkmann and Hardy declarations meet that standard. *See* Brinkmann Decl., ECF No. 36-3 at 2 ¶ 1; *see also* Hardy Decl., ECF No. 36-4 at 2-3 ¶ 1.

Freedom Watch's third argument—that DOJ's search is inadequate because DOJ's declarants "did not say which search terms provided what information, how the records were searched, or what types of records were searched," Pl.'s Opp'n, ECF No. 37 at 5—fares no better. DOJ argues—and the Court agrees—that Freedom Watch "cites no authority for the proposition that an agency must map out specifically which search terms yielded what specific potentially responsive records, and [DOJ is] not aware of any such requirement." Defs.' Reply, ECF No. 38 at 10. "Courts in this [D]istrict, moreover, have declined to require agencies to provide the granularity of detail in their declarations that [Freedom Watch] seeks." *Coffey v. Bureau of Land Mgmt.*, 249 F. Supp. 3d 488, 501 (D.D.C. 2017). And DOJ retains "discretion in crafting a list of search terms that [it] believe[s] to be reasonably tailored to uncover documents responsive to the FOIA request." *Liberation Newspaper v. U.S. Dep't of State*, 80 F. Supp. 3d 137, 146 (D.D.C. 2015) (citation and internal quotation marks omitted). "Where the search terms are reasonably calculated to lead to responsive documents, the Court should not 'micro manage' the agency's search." *Id.*

(quoting *Johnson v. Exec. Office for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002)). Freedom Watch does not challenge DOJ's search terms, *see* Pl.'s Opp'n, ECF No. 37 at 5; thus, this Court will not micro-manage DOJ's searches. Neither will the Court require additional details about DOJ's searches because the Brinkmann and Hardy declarations are "relatively detailed and non-conclusory," *Mobley v. CIA*, 806 F.3d 568, 581 (D.C. Cir. 2015).

The Court therefore finds that DOJ's search is adequate under the standard of reasonableness. *See Truitt*, 897 F.2d at 542. Accordingly, the Court **GRANTS** DOJ's motion for summary judgment as to the adequacy of the search.

### B. Information Withheld Under Exemption 5's Deliberative Process Privilege

The Court next considers DOJ's withholdings under Exemption 5. "Exemption 5 permits an agency to withhold materials normally privileged from discovery in civil litigation against the agency." *Tax Analysts v. IRS*, 117 F.3d 607, 616 (D.C. Cir. 1997). To withhold a document under Exemption 5, the "document must meet two conditions: [1] its source must be a Government agency, and [2] it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Stolt-Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 733 (D.C. Cir.

2008) (citation and internal quotation marks omitted). Exemption 5's deliberative process privilege is one of the privileges against discovery, and that privilege protects from disclosure documents that would reveal an agency's deliberations prior to arriving at a particular decision. *Dent v. Exec. Office for U.S. Att'ys*, 926 F. Supp. 2d 257, 267-68 (D.D.C. 2013).

To fall within the scope of the deliberative process privilege, withheld materials must be both "predecisional" and "deliberative." *Mapother v. DOJ*, 3 F.3d 1533, 1537 (D.C. Cir. 1993). A communication is predecisional if "it was generated before the adoption of an agency policy" and deliberative if it "reflects the give-and-take of the consultative process." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). "[E]ven if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue[.]" *Id.* The deliberative process privilege is to be "construed as narrowly as consistent with efficient Government operation." *Taxation with Representation Fund v. IRS*, 646 F.2d 666, 667 (D.C. Cir. 1981).

Here, OIP withheld, in part, 116 pages of responsive records that the Brinkmann declaration describes as "communications and 'Weekly Press Reports' generated by, exchanged within, and wholly internal to, the DOJ." Brinkmann

Decl., ECF No. 36-3 at 14 ¶ 32. OIP's withholdings fall into two categories: (1) "deliberative discussions regarding press coverage and press inquiries"; and (2) "deliberative notes regarding press coverage and press inquiries." Defs.' Mem., ECF No. 36-1 at 20 (citing Brinkmann Decl., ECF No. 36-3 at 14 ¶ 33); *see also* Defs.' Ex. 1, ECF No. 36-3 at 58 (OIP's *Vaughn* Index). The Court will analyze each category in turn.

### 1. Deliberative Discussions Regarding Press Coverage and Press Inquiries

The first category consists of three separate pages of internal communications with redactions to each page. *E.g.*, Brinkmann Decl., ECF No. 36-3 at 13 ¶ 29; Defs.' Ex. 1, ECF No. 36-3 at 58. Specifically, the Brinkmann declaration states:

> This category of records consists of internal email communications from SCO staff to SCO's public affairs officials providing press inquiries sent directly to them and noting preliminary thoughts on if and how the SCO might respond. In each instance, SCO staff are reacting in real time, sharing their opinions and suggestions for how to the SCO might respond to particular press inquiries.

Brinkmann Decl., ECF No. 36-3 at 15 ¶ 35.

Freedom Watch hypothesizes that the communications involve "the secret meetings with Peter Carr, spokesperson for the [SCO] and media representatives." Pl.'s Opp'n, ECF No. 37 at 8. Freedom Watch contends that the redactions to DOJ's internal communications in the first category are neither pre-decisional

nor deliberative. *See id.* at 6-7. DOJ argues—and the Court agrees—that the redactions to the communications are deliberative and pre-decisional. Defs.' Mem., ECF No. 20-23. These documents squarely fall within the ambit of Exemption 5's deliberative process privilege "[b]ecause these documents reflect intra-agency deliberations on communications with the media." *Freedom Watch, Inc. v. NSA*, 49 F. Supp. 3d 1, 8 (D.D.C. 2014), *aff'd and remanded by* 783 F.3d 1340 (D.C. Cir. 2015); *accord Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 736 F. Supp. 2d 202, 208 (D.D.C. 2010) (finding that agency properly withheld under Exemption 5 "email messages involving recommendations and evaluations for how to respond to Congressional and media requests for information on [certain topics]"). Exemption 5 covers these pre-decisional documents because DOJ explains that "the redacted material contains evaluative discussion and preliminary assessments by [DOJ] staff as they analyzed, made recommendations, gave advice, and worked toward formulating strategies for responding to the press." Defs.' Mem., ECF No. 36-1 at 21; *see also* Brinkmann Decl., ECF No. 36-3 at 17 ¶¶ 40-41.

To be sure, courts in this District have consistently held that Exemption 5 protects from disclosure "media-related withholdings" reflecting an agency's "ongoing decisionmaking about 'how the agency's activities should be described to the

20

general public.'" *Competitive Enter. Inst. v. EPA*, 12 F. Supp. 3d 100, 118 (D.D.C. 2014) (quoting *Nat'l Sec. Archive v. FBI*, No. 88-1507, 1993 WL 128499, at *2 (D.D.C. Apr. 15, 1993)); *accord Competitive Enter. Inst. v. EPA*, 232 F. Supp. 3d 172, 188 (D.D.C. 2017) (finding that Exemption 5 protected documents "clearly generated as part of a media strategy in response to FOIA litigation" and that "correspondence [was] predecisional in that it pre-dated the release of a public statement and [was] deliberative because it involved personal opinions and thoughts of staff members working to identify the options").

### 2. Deliberative Notes Regarding Press Coverage and Press Inquiries

The second category consists of 113 pages of notes in the SCO's "Weekly Press Report" that "document[s] and aid[s] determinations as to whether and how to address press inquiries." Brinkmann Decl., ECF No. 36-3 at 15 ¶ 37. A Weekly Press Report, generated by SCO's public affairs officials, is a "chart with seven columns that documents the following: (1) date of the press inquiry; (2) the media outlet; (3) the name of the reporter; (4) the method of contact; (5) the subject of the inquiry; (6) research – which documents steps taken in preparation of a response, if any; and (7) a proposed final response to that inquiry." *Id*. at 15-16 ¶ 37. The Weekly Press Reports contain redacted information in the "research" and

"final response" columns, including "public affairs officials'
notes of what steps should be taken in order to develop a final
response to press inquiries, if any." Defs.' Mem., ECF No. 36-1
at 21. As such, the "final response" column "does not actually
include the ultimate ('final') response to the media." *Id.*; *see
also* Brinkmann Decl., ECF No. 36-3 at 16 ¶ 38 ("Despite the
naming of [the "final response"] column, the information within
it does not consist of final responses to the press inquiries
but rather, recommendations regarding a potential response.").

DOJ argues that the redacted information in the "research"
and "final response" columns is deliberative because: (1) the
notes summarize events, identify issues, and provide background
information in order to determine the most important issues and
information for senior SCO staff to review; and (2) SCO staff
made decisions to include certain factual information in the
notes during their research and preparation for a final
response. Defs.' Mem., ECF No. 36-1 at 22. DOJ goes on to argue
that "the culling of other factual information was, in and of
itself, a necessary part of the SCO's deliberations." *Id*.

For its part, Freedom Watch appears to argue that the
withholdings are not deliberative because the redacted
information in the Weekly Press Reports do not discourage candid
discussion, and that its FOIA request seeks only the final
document that does not limit candid discussion. Pl.'s Opp'n, ECF

No. 37 at 8.[6] Freedom Watch correctly points out that the "key question [is] . . . whether the disclosure of materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Id.* (quoting *Dudman Commc'ns. Corp. v. Dep't of the Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987)). But the Brinkmann declaration directly addresses this point. *See* Brinkmann Decl., ECF No. 36-3 at 17-18 ¶¶ 40-41.

The declarant avers that the "[p]rotected portions of these records reflect proposed actions provided to the SCO public affairs officials by SCO staff regarding how to respond to press inquiries, notes on research and steps taken in the SCO's preparation for responding to media inquiries, and selected media inquiries and publications flagged for awareness and determinations on whether any further actions may be necessary." *Id*. at 17 ¶ 40. The declarant states that release of the SCO's public affairs officials' notes would result in DOJ employees becoming "reticent to document notes of their internal decision-making processes, to share their opinions, and they would be

---

[6] To support its arguments as to the Exemption 5 withholdings, Freedom Watch cites 11 C.F.R. § 5.4(a)(4). Pl.'s Opp'n, ECF No. 37 at 8. That regulation, however, applies to the Federal Election Commission, *see* 11 C.F.R. § 5.4(a)(4), and Freedom Watch fails to explain its relevance. The Court therefore finds that 11 C.F.R. § 5.4(a)(4) is inapplicable to this case.

circumspect in their willingness to engage in internal discussions with other employees." *Id.* at 17 ¶ 41. In addition, the declarant avers that "[d]isclosure of such preliminary assessments and opinions would make officials contributing to pre-decisional deliberations much more cautious in providing their views." *Id.* Having reviewed the averments in the Brinkmann declaration, the Court finds that the redacted information in the Weekly Press Report qualifies for protection under the deliberative-process privilege, and the disclosure of such information would "stifle the creative thinking and candid exchange of ideas necessary to produce good" work product. *Dudman*, 815 F.2d at 1569.

Next, Freedom Watch contends that DOJ fails to "say whether the communications, however, preliminary, were used in a final decision." Pl.'s Opp'n, ECF No. 37 at 7. Freedom Watch, however, acknowledges DOJ's assertion that the redacted information is pre-decisional because "the discussions 'pre-date the final response.'" *Id.* (quoting Defs.' Mem., ECF No. 36-1 at 20); *see also* Defs.' Mem., ECF No. 36-1 at 20 ("[T]he material is predecisional because it either consists of ongoing discussions that pre-dated the final responses to press inquiries, or reflects pre-decisional deliberations."). Indeed, "courts have generally found that documents created in anticipation of press inquiries are protected even if crafted after the underlying

event about which the press might inquire" because "[t]he idea is that these sorts of documents reflect deliberation about the decision of how to respond to the press[.]" *Protect Democracy Project, Inc. v. U.S. Dep't of Def.*, 320 F. Supp. 3d 162, 177 (D.D.C. 2018) (collecting cases). Here, DOJ argues—and the Court agrees—that "Ms. Brinkmann's description of the materials withheld under Exemption 5 is more than sufficient to establish that they are pre-decisional." Defs.' Reply, ECF No. 38 at 12. And Freedom Watch ignores the averment in the Brinkmann declaration that clearly explains the withholdings "pertain to entirely internal pre-decisional notes and emails among SCO staff." Brinkmann Decl., ECF No. 36-3 at 17 ¶ 40.

Freedom Watch's next argument is that the withholdings are not pre-decisional because the withholdings lost the protection under Exemption 5's deliberative process privilege when DOJ "ch[ose] *expressly* to adopt or incorporate" the redacted information in a final agency decision. Pl.'s Opp'n, ECF No. 37 at 7 (emphasis added) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 161 (1975)). In *Sears*, the Supreme Court held "that, if an agency chooses expressly to adopt or incorporate by reference an intra-agency memorandum previously covered by Exemption 5 in what would otherwise be a final opinion, that memorandum may be withheld only on the ground that it falls within the coverage of some exemption other than Exemption 5."

421 U.S. at 161 ("[W]hen adopted, the reasoning becomes that of the agency and becomes its responsibility to defend."). But the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") rejected a FOIA requester's argument that the FBI waived the deliberative process privilege by adopting a legal opinion by DOJ's Office of Legal Counsel ("OLC") in dealings with Congress and the Office of the Inspector General because the FOIA requester could not "point to any evidence supporting its claim that the FBI expressly adopted the OLC Opinion as its reasoning." *Elec. Frontier Found. v. DOJ*, 739 F.3d 1, 11 (D.C. Cir. 2014). The same is true here. As noted by DOJ, Freedom Watch "does not point to any evidence supporting its claim that OIP expressly adopted any of the withheld material in a final response." Defs.' Reply, ECF No. 38 at 12.

Finally, Freedom Watch concedes DOJ's argument that the redacted information in the Weekly Press Report reflects the SCO's pre-decisional deliberative process because such information constitutes "the culling of other factual information [that] was, in and of itself, a necessary part of the SCO's deliberations." Defs.' Mem., ECF No. 36-1 at 22; *see also* Pl.'s Opp'n, ECF No. 37 at 5-8. Nonetheless, "the Court still has an independent duty to 'determine for itself whether the record and any undisputed material facts justify granting summary judgment.'" *Tokar v. DOJ*, 304 F. Supp. 3d 81, 94 n.3

(D.D.C. 2018) (quoting *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 505 (D.C. Cir. 2016)). Based on DOJ's description of the redacted information in the Weekly Press Report, *see, e.g.*, Defs.' Mem., ECF No. 36-1 at 21-22; Brinkmann Decl., ECF No. 36-3 at 15-18 ¶¶ 37-41; Defs.' Ex. 1, ECF No. 36-3 at 58, the Court is satisfied that the redacted information that reflects the culling of certain factual information is exempt under Exemption 5, *see Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513-14 (D.C. Cir. 2011) (concluding that Exemption 5 covered factual summaries because those documents "were culled by the Committee from the much larger universe of facts presented to it" and reflected an "exercise of discretion and judgment calls").

In sum, the Court therefore finds that DOJ has carried its burden of demonstrating that the withholdings fall under Exemption 5's deliberative process privilege. *See Coastal States Gas Corp.*, 617 F.2d at 868 ("[T]he agency has the burden of establishing what deliberative process is involved, and the role played by the documents in issue in the course of that process."). Accordingly, the Court **GRANTS** DOJ's motion for summary judgment as to Exemption 5.

### C. Information Withheld Under Exemptions 6 and 7(C)

The Court next turns to the withholdings under Exemptions 6 and 7(C). DOJ withheld six narrow categories of information

under Exemption 6: (1) the names and personal identifying information of certain DOJ and FBI employees based on the sensitive nature of the SCO's work and the law enforcement conduct; (2) the reporters' non-public contact information; (3) the third parties' names and personal identifying information merely referenced in the records; (4) the non-public information of third parties contained in e-mails from reporters; (5) information concerning DOJ employees and reporters prior to the SCO's investigation; and (6) details about purely personal material pertaining to DOJ employees, reporters, and third parties (*i.e.* vacation details, holiday plans, and religious observances). Defs.' Mem., ECF No. 36-1 at 24-29. And DOJ withheld portions of a single e-mail communication under Exemption 7(C), which contained information that a member of the media believed was potentially relevant to the SCO's investigation. *Id.* at 30 (citing Brinkmann Decl., ECF No. 36-3 at 25-26 ¶¶ 56-58).

To begin, "[t]he privacy interest in Exemption 6 is narrower than in Exemption 7(C), so if the withholdings satisfy the former, no examination of the latter is necessary." *McCann v. U.S. Dep't of Health & Human Servs.*, 828 F. Supp. 2d 317, 322 (D.D.C. 2011); *see also Prop. of the People, Inc. v. DOJ*, 405 F. Supp. 3d 99, 112 (D.D.C. 2019) (Sullivan, J.) ("Both exemptions are foundationally similar."). "Exemption 6 protects

withholdings under the following criteria: first, the information must be contained within 'personnel and medical files and similar files'; second, the disclosure of the information 'would constitute a clearly unwarranted invasion of personal privacy'; and third, if the first two requirements are met, the privacy interest must be weighed against the public interest in disclosure." *McCann*, 828 F. Supp. 2d at 322 (quoting 5 U.S.C. § 552(b)(6); citing *Armstrong v. Exec. Office of the President*, 97 F.3d 575, 582 (D.C. Cir. 1996)).

## 1. Similar Files

DOJ satisfies the first requirement of the Exemption 6 inquiry because the Supreme Court has broadly interpreted the phrase "similar files," recognizing that Exemption 6 covers all "information which applies to a particular individual." *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982); *see also Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 152 (D.C. Cir. 2006) (explaining that Exemption 6 covers "not just files, but also bits of personal information, such as names and addresses"). "[I]nformation about an individual should not lose the protection of Exemption 6 merely because it is stored by an agency in records other than 'personnel' or 'medical' files." *Wash. Post Co.*, 456 U.S. at 601.

Nonetheless, Freedom Watch relies on *Simpson v. Vance*, 648 F.2d 10 (D.C. Cir. 1980) for the proposition that "the

information sought – particularly the information concerning government personnel and third party information received from reporters – is not considered a personnel file[.]" Pl.'s Opp'n, ECF No. 37 at 10. In *Simpson*, the D.C. Circuit ruled that "[t]he [requested] information contained in [the State Department's publication] [did] not fall within the meaning of 'personnel' files or 'similar' files, and the additional fact that foreign service personnel [were] subject to terrorist attacks [did] not change the personal quality of the information contained in the materials at issue: no fact of an intimate nature or no embarrassing disclosure suddenly appear[ed] because [the D.C. Circuit was] told that the information might be abused by terrorists once disclosed." 648 F.2d at 17.

Freedom Watch is wrong on the law, and the D.C. Circuit's decision in *Simpson* upon which Freedom Watch relies is no longer good law. *See Wash. Post. Co.*, 456 U.S. at 602 n.5; *see also* Pl.'s Opp'n, ECF No. 37 at 9-10. As DOJ correctly notes, "[t]wo years after that decision, the Supreme Court, in *[United States] Department of State v. Washington Post Company*, 456 U.S. 595 (1982), abrogated *Simpson* and held that the 'similar files' language in Exemption 6 must be interpreted broadly, and that any information in government records that 'applies to a particular individual' meets the threshold for Exemption 6 protection." Defs.' Reply, ECF No. 38 at 13 (quoting *Wash. Post.*

*Co.*, 456 U.S. at 602). Freedom Watch's reliance on *Simpson* is perplexing given that a member of this Court relied on the Supreme Court's decision in *United States Department of State v. Washington Post Company* in a FOIA case brought by Freedom Watch, and explained that the "similar files" categorization "broadly include[s] documents containing purely personal information," such as "personal e-mail addresses, phone numbers, and details of individuals' personal lives." *Freedom Watch, Inc. v. NSA*, 49 F. Supp. 3d at 9 (citations and internal quotation marks omitted). More troubling is that one of the cited cases in Freedom Watch's opposition brief expressly states that "the Supreme Court issued its opinion in [*United States*] *Department of State v. Washington Post* [*Company*], 456 U.S. 595 (1982), rejecting this [C]ircuit's rule, *see Simpson v. Vance*, 648 F.2d 10, 13 (D.C. Cir. 1980), that the phrase 'similar files' in § 552(b)(6) is limited to files within which may be found 'intimate details' and 'highly personal' information." *Arieff v. U.S. Dep't of Navy*, 712 F.2d 1462, 1466 (D.C. Cir. 1983); *see also* Pl.'s Opp'n, ECF No. 37 at 9 (citing *Arieff*, 712 F.2d at 1468-69).

## 2. Privacy Interests

The Court next considers the second requirement—"the information must be of such a nature that its disclosure would constitute a clearly unwarranted invasion of personal privacy."

*Wash. Post Co.*, 456 U.S. at 598. "This, in turn, requires a two-part analysis." *SAI v. Transp. Sec. Admin.*, 315 F. Supp. 3d 218, 259 (D.D.C. 2018). First, the Court must "determine whether disclosure of the files would compromise a substantial, as opposed to *de minimis*, privacy interest, because [i]f no significant privacy interest is implicated . . . FOIA demands disclosure." *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1229 (D.C. Cir. 2008) (citation and internal quotation marks omitted). If the agency demonstrates that "a substantial privacy interest is at stake, then [the Court] must balance the privacy interest in non-disclosure against the public interest." *Consumers' Checkbook Ctr. for the Study of Servs. v. U.S. Dep't of Health & Human Servs.*, 554 F.3d 1046, 1050 (D.C. Cir. 2009). "Substantial, in this context, means less than it might seem. A substantial privacy interest is anything greater than a *de minimis* privacy interest." *Humane Soc'y of United States v. Animal & Plant Health Inspection Serv.*, 386 F. Supp. 3d 34, 43 (D.D.C. 2019) (citation and internal quotation marks omitted).

Here, DOJ has demonstrated that the individuals' privacy interests are substantial. OIP withheld the names and contact information of certain SCO and law enforcement personnel after "[c]onsidering the sensitive and often contentious nature of the work of the SCO, as well as the work law enforcement personnel conduct." Brinkmann Decl., ECF No. 36-3 at 24 ¶ 53. OIP and the

FBI withheld the personal e-mail addresses and telephone numbers of reporters on the basis that "the release of such information could subject those individuals to unwarranted harassment in their personal time and personal lives." *Id.* at 24 ¶ 54; *see also* Hardy Decl., ECF No. 36-4 at 12 ¶ 27 ("[T]he public could draw negative conclusions based on their inquiries to OPA or devote unwanted attention and/or harassment toward the individuals based on their communications with OPA if their identities were publicly disclosed."). In addition, OIP and the FBI withheld the names and personal identifying information of third parties referenced in the records at issue to prevent unwarranted harassment. Defs.' Mem., ECF No. 36-1 at 27-29. Finally, OIP redacted purely personal information of reporters, third parties, and DOJ employees, such as "vacation details, holiday plans, religious observances, and other similar information unrelated to any government function or activity." *Id.* at 29.

Freedom Watch argues that DOJ's "examples" of the privacy interests of the government personnel, reporters, and third parties constitute a "speculative secondary effect condemned in *Arieff*." Pl.'s Opp'n, ECF No. 37 at 9. In dicta, the D.C. Circuit in *Arieff* stated that Exemption 6 "does not apply to an invasion of privacy produced *as a secondary effect* of the release . . . . [I]t is the very 'production' of the documents

which must 'constitute a clearly unwarranted invasion of personal privacy.'" 712 F.2d at 1468 (citation omitted); *see also Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 877 (D.C. Cir. 1989). In *Arieff*, the government invoked Exemption 6 to withhold information that contained the names and amounts of prescription drugs supplied to the Office of Attending Physician to the United States Congress ("OAP"), but the information sought there did not identify a particular member of Congress. 712 F.2d at 1466-68. The D.C. Circuit held that Exemption 6 did not cover the information about the prescription drugs because the records contained no information directly attributable to an individual. *Id.* at 1467 (concluding that the FOIA requester "established no more than a 'mere possibility' that the medical condition of a particular individual might be disclosed"). The opposite is true here. The disclosure of the redacted information in this case would work a clearly unwarranted invasion of personal privacy because such information is attributable to individuals. *See Arieff*, 712 F.2d at 1467-68. As stated by DOJ, "the release of the requested information would not result in a mere theoretical possibility of an invasion of privacy, or mere speculation regarding the names contained in the withheld material." Defs.' Reply, ECF No. 38 at 14.

DOJ points out—and the Court agrees—that the release of

information connecting any individual to "the politically charged environment surrounding the SCO's work" would subject him or her to unwarranted harassment. Defs.' Mem., ECF No. 36-1 at 27-28. The historical significance and high-profile nature of the SCO's investigation into the Russian government's efforts to interfere in the 2016 presidential election have generated widespread debate and speculation. It is beyond dispute that the government employees in the SCO and the FBI were working in "sensitive agencies" and "sensitive occupations." *Long v. Office of Pers. Mgmt.*, 692 F.3d 185, 192 (2d Cir. 2012); *see also Walston v. U.S. Dep't of Def.*, 238 F. Supp. 3d 57, 67 (D.D.C. 2017) (Sullivan, J.).

In *Walston*, this Court found that the agency properly withheld the names and other personal identifying information of low-level government employees who conducted an investigation into the plaintiff's allegations of hacking activity by a government employee because the investigators had a "cognizable privacy interest in keeping their names from being disclosed" because they were "employed in a 'sensitive agenc[y]' and [had] 'sensitive occupations.'" 238 F. Supp. 3d at 67 (citation omitted); *cf. Judicial Watch, Inc.*, 736 F. Supp. 2d at 211 ("It is well-established that information identifying law enforcement and support personnel can be withheld pursuant to Exemption 7(C)."). For the same reasons, the Court therefore finds that

DOJ properly withheld the names and other personal identifying information of the government employees, reporters, and third parties in the responsive materials based on their substantial privacy interests.

### 3. The Privacy Interests Outweigh the Public Interest

The Court turns to the balancing of the privacy interests against the public interest. The privacy interests at stake here outweigh the public interest in the release of the redacted information. Freedom Watch contends that the disclosure of the redacted information "is necessary to disseminate to the public any information concerning grand jury leaks and other confidential information made by the media and leaked by the spokesperson." Pl.'s Opp'n, ECF No. 37 at 10. In response, DOJ argues that Freedom Watch's assertion is nothing more than a "wholly unsubstantiated claim," and that Freedom Watch "offers nothing to show why the public interest in the withheld material outweighs the substantial privacy interests involved." Defs.' Reply, ECF No. 38 at 14. DOJ contends that Freedom Watch's "suggestion of wrongdoing is pure speculation that is, of course, inaccurate and unsupported by any evidence." *Id.* (citing *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 173 (2003)).

"In this balancing analysis, [Freedom Watch] bears the

burden of establishing a legitimate public interest supporting

disclosure which is in line with the core purpose of FOIA, to

contribute to greater general understanding of agency practice

and procedure." *Walston*, 238 F. Supp. 3d at 67 (citation

omitted). Freedom Watch has failed to do so. Freedom Watch has

not demonstrated how the personal information of the government

employees, reporters, and third parties will "help the public

stay informed about 'what their government is up to.'" *Am.*

*Immigration Lawyers Ass'n v. Exec. Office for Immigration*

*Review*, 830 F.3d 667, 674 (D.C. Cir. 2016) (quoting *DOJ v.*

*Reporters Comm. For Freedom of Press*, 489 U.S. 749, 773 (1989)).

The Court therefore finds that DOJ properly withheld the

redacted information under Exemptions 6 and 7(C). Accordingly,

the Court **GRANTS** DOJ's motion for summary judgment as to

Exemptions 6 and 7(C).[7]

> ### D. **The Disclosure of Reasonably Segregable, Non-Privileged Material**

Finally, DOJ argues that it is entitled to summary judgment

---

[7] Having found that Freedom Watch failed to carry its burden of demonstrating that the disclosure of the redacted information would advance the public interest under Exemption 6, the Court need not decide whether Freedom Watch met its evidentiary burden under *Favish*. *See Favish*, 541 U.S. at 174 (When "the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties," the FOIA requester has the burden under Exemption 7(C) to "establish more than a bare suspicion in order to obtain disclosure" and "produce evidence that would warrant a belief" of "the alleged Government impropriety[.]").

on its segregability determinations. Defs.' Mem., ECF No. 36-1 at 31. Freedom Watch does not advance any legal arguments in opposition to DOJ's segregability determinations. *See* Pl.'s Opp'n, ECF No. 37 at 12. Rather, Freedom Watch argues that "without the Court's *in camera* review, [DOJ has] not clearly demonstrated that the documents [Freedom Watch] seeks contain no reasonably segregable factual information." *Id*. DOJ disagrees, arguing that "[t]he Brinkmann and Hardy declarations confirm that OIP and [the] FBI, respectively, conducted a line-by-line review to carefully determine in good faith what portions of responsive materials could be released and what portions must be withheld." Defs.' Reply, ECF No. 38 at 16.

The Court has an "affirmative duty" to consider whether DOJ has satisfied its segregability obligations. *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999). "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" from the FOIA requester. *Sussman v. U.S. Marshals Serv.*, 494 F. 3d 1106, 1117 (D.C. Cir. 2007). Such a presumption is warranted in this case.

Here, the Brinkmann and Hardy declarations aver that all reasonably segregable, non-exempt information has been released to Freedom Watch. *E.g.*, Brinkmann Decl., ECF No. 36-3 at 25 ¶ 55

("There is no additional, non-exempt information that can be segregated for release to Plaintiff."); Hardy Decl., ECF No. 36-4 at 15 ¶ 32 ("The FBI provided Plaintiff all non-exempt records or portions of records responsive to its FOIA request."); *id*. at 16 ¶ 36 ("The FBI . . . released all reasonably segregable, non-exempt information[.]"). The first declarant confirms that "OIP conducted a line-by-line review of the responsive documents to determine in good faith what material should be released consistent with FOIA's requirements." Brinkmann Decl., ECF No. 36-3 at 25 ¶ 55. The second declarant confirms the same. Hardy Decl., ECF No. 36-4 at 15 ¶ 32 ("During the processing of [Freedom Watch's] request, a line by line review of each responsive page was conducted to identify non-exempt information that could be reasonably segregated and released.").

Freedom Watch fails to present a "quantum of evidence" that overrides the presumption in favor of DOJ's segregability determinations. *Sussman*, 494 F. 3d at 1117. DOJ did not withhold in full any responsive materials. *See, e.g.*, Defs.' Reply, ECF No. 38 at 16; Defs.' Ex. 1, ECF No. 36-3 at 57-80; Defs.' Ex. 2, ECF No. 36-4 at 37-42. And Freedom Watch does not identify one document or piece of information to show that DOJ failed to satisfy its obligations to segregate exempt information from non-exempt information. *See* Pl.'s Opp'n, ECF No. 37 at 12. The Court therefore finds that DOJ's *Vaughn* indices and declarations

demonstrate that all reasonably segregable, non-exempt information has been released to Freedom Watch. The Court need not conduct an *in camera* review because DOJ adequately describes its segregability analysis and justifies its withholdings under Exemptions 5, 6, and 7(C). *See Mead Data Cent. v. U.S. Dep't of Air Force*, 566 F.2d 242, 262 (D.C. Cir. 1977) ("[A] district court need not conduct its own in camera search for segregable non-exempt information unless the agency response is vague, its claims too sweeping, or there is a reason to suspect bad faith.").[8]

## IV.  Conclusion

For the reasons set forth above, the Court **GRANTS** DOJ's Motion for Summary Judgment. A separate Order accompanies this Memorandum Opinion.

**SO ORDERED**

**Signed:    Emmet G. Sullivan**
            **United States District Judge**
            **March 23, 2020**

---

[8] Freedom Watch requests an *in camera* review of the redacted information in the responsive materials. Pl.'s Opp'n, ECF No. 37 at 12. DOJ argues that "*in camera* review is particularly unwarranted because the agencies have demonstrated that the redacted material falls within Exemptions 5, 6, and 7(C)." Defs.' Reply, ECF No. 38 at 17. The Court agrees. The Court will not exercise its discretion to conduct an *in camera* review. *See* 5 U.S.C. § 552(a)(4)(B); *see also Canning v. U.S. Dep't of State*, 134 F. Supp. 3d 490, 502 (D.D.C. 2015) ("*In camera* review is a last resort." (citation and internal quotation marks omitted)). Having found that DOJ is entitled to summary judgment, the Court **DENIES** Freedom Watch's request for an *in camera* review.